In the United States Court of Appeals
for the Western District of Arkansas
Fayetteville Division

| | |
|---|---|
| The Liberty Initiative, Inc. (dba "Arkansas Justice Reform Coalition"); and Sarah Moore | Plaintiffs |
| | Case no: |
| *vs.* | 5:24-cv-5120-TLB |
| Washington County, Arkansas | Defendant |

═══════════════════════════════════════

## First Amended Complaint

═══════════════════════════════════════

COMES NOW Plaintiff The Liberty Initiative, Inc. (dba "Arkansas

Justice Reform Coalition") (the "AJRC"), by and through counsel

Matt Kezhaya (ABA # 2014161), with a first amended complaint

about the misallocation of federal funds pursuant to FRCP 15(a).

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction. 28 USC § 1331;

*see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658

(1978) (at issue are official policies of a county government, to

which there is no sovereign immunity defense).

2.     This Court has general personal jurisdiction over Defendant.

3.     Venue properly lies in this Court.

## PARTIES

4.     Plaintiff AJRC is a grassroots tax-exempt nonprofit corpora-
tion with its principal offices in Rogers, Arkansas. The AJRC's or-
ganizational purpose is to advocate for criminal justice reform and
ameliorate the second-hand effects of incarceration. The AJRC
sought a grant from Washington County for an approved use of
funds and was denied for favor of a noncompliant use of funds.

5.     Plaintiff Sarah Moore is the executive director of the AJRC.
Ms. Moore is a taxpaying citizen who resides in Fayetteville, which
is located within Washington County, and objects to Washington
County's unlawful use of her tax dollars.

6.     Defendant Washington County, Arkansas is a county govern-
ment within this District. Washington County was entrusted with
federal funds to mitigate the effects of COVID-19. Washington

County is instead using the funds to expand its jail facilities, which runs afoul of regulatory guidance.

## FACTS COMMON TO ALL CLAIMS

### Congress allocates federal funds to combat COVID-19

7.      Beginning in late-2019, a pernicious virus known by the shorthand COVID-19 caused the most devastating global pandemic in a century. As the bodies piled, every level of American government undertook historic efforts to contain and combat the disease.

8.      In 2021, Congress authorized $350 billion to shore up a social and economic landscape ravaged by COVID-19. These funds were to be used "only" to cover those costs that were necessarily incurred due to the public health emergency with respect to COVID-19, and other requirements. 42 USC § 801(d).

9.      Of the appropriated funds, Congress allocated about $65 billion to county governments. 42 USC § 803(b)(3). These funds were also conditioned on the response to COVID-19 and its negative economic impacts, "including assistance to … nonprofits." 42 USC §

803(c)(1)(A).

10.     Pursuant to the above appropriations, Washington County received about $46 million in funding. Half was received in June 2021, and half in June 2022.

## AJRC is denied funding on equal terms

11.     In December 2021, representatives of UPSKILL NWA sought $2.9 million of the federal funds to train healthcare workers.

12.     The Washington County Quorum Court approved Upskill's request in full without any requirement of an application process.

13.     In October 2022, a Washington County employee sought some of the federal funds for Returning Home; a Christian nonprofit organization which operates a jail diversion program for men, only men, who would have otherwise been housed in the Washington County Jail.[1]

---

[1] Returning Home is a prison ministry, and requires its wards to participate in Christian programming as a condition of avoiding incarceration in the Washington County jail.

14.   Washington County gave this second nonprofit organization some of the federal funds without requirement of application.

15.   All other nonprofits and nongovernmental organizations were subjected to an application process.

16.   Pursuant to the formal application process, the AJRC timely issued an application for $290,000 in funding in a form promulgated by Washington County. **Exhibit 1** (the application).

17.   The grant applied for sought to fund two care managers who would assist low-income populations, regardless of gender, affected by the criminal justice system with navigating challenges surrounding housing, employment, and legal difficulties. **Exhibit 1**, at 2.

18.   Just like the Returning Home use of funds, this would have helped alleviate the jail population at the Washington County jail by ending the population's involvement in the criminal justice system.

19.   Unlike the Returning Home use of funds, this benefit would have aided women. Returning Home only serves men.

20.     The AJRC's application satisfied regulatory presumptions which were designed to facilitate the determination of eligible uses of funds. See 42 USC § 801(f)(1) (authorizing regulations); see also 31 CFR § 35.6(b)(2)(iii) and (3)(ii)(A)(8). Particularly, the AJRC's application would have served low-income households and under-employed individuals, both which "are presumed to be dispropor-tionately impacted" by COVID, by connecting the population to job training, assisting them with their job search, and more generally empower them with the skills and confidence to thrive as active par-ticipants in the community and to break the jail cycle.

21.     The AJRC's application was one of 46 seeking about $30 mil-lion of the funds allocated to Washington County.

22.     Washington County retained the Northwest Arkansas Eco-nomic Development District to ascertain whether these applications should be granted.

23.     Upon a review of the applications, the Northwest Arkansas Economic  Development  District  proposed  approving  seven

applications seeking a combined $564,481.

24.     The District's opinions that these applications should be approved were supported by written opinions, but there were no written opinions to support the recommendation against approving the remainder.

25.     Washington County never approved any of the applications recommended by the District. The only non-profits who received any of the federal funds were those that were never subjected to any public oversight in the first place.

## A renewed campaign to expand the jail is unsuccessful.

*The campaign to expand the jail predates the pandemic.*

26.     Rather than grant the AJRC's application, Washington County has allocated the funds to construct new jail facilities. This was part and parcel of a pre-pandemic effort to expand the jail.

27.     In January 2019, the Washington County Sheriff asked the Washington County Quorum Court to approve a special election for a sales tax increase to fund a $38 million jail expansion. Under

this proposal, the Washington County voters would vote on a temporary half-cent increase to fund jail expansion and a permanent quarter-cent increase to fund ongoing operation and maintenance.

28.     The proposal failed to make it out of the then-existing Jail/Law Enforcement/Courts Committee. On June 10, 2019, Sam Duncan (then Justice of the Peace for District 7) indicated that these proposals were "gone forever."

*Overcrowding can be reduced without jail expansion*

29.     In 2019, Washington County commissioned a study of its criminal justice system by the National Center for State Courts, which are nationally regarded experts in the field of criminal justice.

30.     The study was completed in August 2020. See **Exhibit 2**.

31.     As more comprehensively detailed in the study, the National Center for State Courts made recommendations to address jail overcrowding without increasing the number of inmates.

32.     The study did not recommend constructing new jail facilities.

33.    Instead, the study recommended expanding drug court and veterans court, paying public defenders on par with prosecutors, a sobering center, drug and alcohol addiction treatment, addressing homeless and educational opportunities for those in the justice system.

34.    The Washington County jail has not implemented the recommended policies. If it did, the jail overcrowding issues would be addressed without jail expansion.

*Overcrowding was recently reduced without expansion*

35.    From April 2020 – Fall 2021, the jail population for the Washington County was reduced through a successful implementation of policies effectuated county-wide.

36.    Participants in these county-wide efforts included the Sheriff, jail administrators, judges, prosecutors, and public defenders. All these stakeholders worked together to reduce the jail population, without expending taxpayer dollars on jail expansion.

37.    At its trough (on April 30, 2020), the average daily jail

population was 346; less than half of the pre-COVID average of 763.

38.   There was no statistically significant increase in crime from this lower number of incarcerated people.

39.   Following the availability of COVID vaccines (in Spring 2021), and the Washington County Sheriff's secret ivermectin experiments on inmates (beginning late-2020),[2] area agencies began arresting more people. This led to an increased jail population.

40.   There was no statistically significant decrease in crime from this higher number of incarcerated people.

*A renewed campaign to expand the jail failed*

41.   During the same time that Washington County was soliciting applications for federal funding, it also renewed the political campaign to expand its jail facilities.

42.   In October 2021, Washington County issued a request for

---

[2] *See Floreal-Wooten v. Helder*, No. 5:22-CV-5011, 2023 WL 2542613 (W.D. Ark. Mar. 16, 2023)

qualifications to design and construct new jail facilities. **Exhibit 3**.

43.  The request opens with statements that the expansion was needed to "better accommodate COVID needs." That is a pretext. COVID had not detrimentally impacted the operation of the Washington County jail for months beforehand, and the desire to expand the jails predated COVID.

44.  The true purpose of the request is reflected on the face of the document: "when the pandemic is over, the additional space will continue to be utilized for initial housing and screening of new intakes." Washington County desires to expand the jails regardless of COVID.

45.  At some point before January 12, 2022, Washington County sought a professional opinion about using these federal funds for the purpose of constructing new jail facilities.

46.  On January 12, 2022, Lindsey Holman (principal consultant

of Holman Strategies)[3] communicated her opinion that Washington County's contemplated use of these federal funds was not in compliance with Congress's intent:

> Below are a few key excerpts which will impact the eligibility of Washington County's jail expansion project. Per the policy, Washington County will be required to reconsider the project.

**Exhibit 7.**[4]

47.    As of April 1, 2024, only two inmates had COVID.

48.    As of April 29, 2024, only one inmate had COVID.

49.    After this request for qualifications was issued, Washington County raised the question of whether to expand the jail facility, at

---

[3] Holman Strategies provides compliance advice for those looking to maintain compliance with federal requirements.
https://www.holmanstrategies.com/services (last visited July 15, 2024).

According to her firm's website, Ms. Holman "serves as the American Rescue Plan Act (ARPA) Advisor, providing federal policy advocacy and compliance advisory services to all 75 counties in Arkansas."
https://www.holmanstrategies.com/ (last visited July 15, 2024).
The federal funds at issue in this litigation were made available through the American Rescue Plan Act of 2021.
[4] This exhibit is numbered out-of-order to maintain the original complaint's numbering scheme.

an anticipated cost of $113.5 million, at a July 2022 meeting of the Washington County Quorum Court.

50.     The question was met with overwhelming opposition, which culminated in Justices of the Peace Madison and Ussery advocating for a special election so the voters could issue a dispositive answer.

51.     The special election was duly conducted in the law provided for by law on November 8, 2022.

52.     The measure failed, with 59% of voters against jail expansion.

**Washington County misappropriates the federal funds.**

53.     In the following month, on December 15, 2022, Washington County adopted Ordinance 2022-123, which appropriated $8.8 million of federal funds to expand the jail. **Exhibit 4**.

54.     Also on December 15, 2022, Washington County appropriated $10 million to the buildings line item. **Exhibit 5**. Funding the construction of a new jail which the voters have explicitly rejected is not the "provision of government services" within the meaning of

42 USC § 803(c)(1)(C)(ii).

55.   Neither appropriation ordinance conforms to the statutory purposes of 42 USC § 803(c) or the implementing regulations. See 35 CFR § 35.1 *et seq.*

56.   The Final Rule,[5] at 199-200, contemplates and generally prohibits using these federal funds to construct a new jail facility. ("constructing a new correctional facility would generally not be a proportional response to an increase in the rate of certain crimes or overall crime as most correctional facilities have historically accommodated fluctuations in occupancy).

57.   The Final Rule also requires that capital expenditures in excess of $1 million must undergo additional analysis to justify the expenditure. That requires Washington County to issue a written justification for the capital expenditure. See Final Rule, at 194, 196. The written justification must: (1) describe the harm or need to be addressed; (2) explain why a capital expenditure is appropriate to

---

[5] (https://home.treasury.gov/system/files/136/SLFRF-Final-Rule.pdf)

address the harm or need; and (3) compare the proposed capital expenditure against alternative capital expenditures that could be made. Id., at 196.

58.    On information and belief, Washington County has not issued a written justification to expand its jail facilities with these federal funds.

59.    The new jail facility contemplated by Washington County will abut the current jail facility and will increase its footprint.

60.    Washington County lacks the financial resources to construct the new jail facility without misappropriating the federal funds. As of February 29, 2024, Washington County only had $2.091 million in unappropriated reserves. **Exhibit 6**. The sums necessary to construct the facility are $18,812,332.75. **Exhibit 5**, at 2.

### COUNTS ASSERTED

## Count 1
Deprivation of a federal right (42 USC § 1983)

61.    By an act of Congress, federal funds were made available to

nonprofit organizations to aid the response to COVID-19. 42 USC § 803(c)(1)(A).

62.     Washington County was entrusted with some of those federal funds and had a duty to distribute them in accordance with the statutory purposes as further refined by the implementing regulations. See 42 USC § 801(d); 35 CFR §§ 35.5(a), 35.6(b)-(h).

63.     The AJRC submitted a timely and proper application which demonstrated its entitlement to the funds. Particularly, the AJRC was entitled to the funds to serve populations affected by unemployment and to serve low-income populations.

64.     Washington County denied the AJRC's application and is instead using all of the federal funds for the impermissible purpose of constructing a new jail facility.

65.     The AJRC is damaged in the amount of $290,000.

## Count 2
Equal Protection Clause violation (42 USC § 1983)

66.     The Equal Protection Clause applies to "official action that

closes a door or denies opportunity to women (or to men)." *United States v. Virginia*, 518 U.S. 515, 532 (1996).

67.     Washington County's use of the federal funds discriminates against women because it has only funded Returning Home (which does not serve women) and has denied funding to the AJRC (which does serves women).

68.     Returning Home and the AJRC otherwise identically further the same governmental purpose of reducing the jail population.

69.     The differential treatment was intentional: at all times, Washington County knew that Returning Home's services would not reduce the number of women who are incarcerated and that AJRC's services would reduce the number of women. Washington County intentionally funded Returning Home, but not AJRC, despite having sufficient federal funds to fund both.

70.     Further, Washington County refused to fund other nonprofits whose services would reduce the number of women who are incarcerated. Besides AJRC, Washington County refused to fund

Magdeline Serenity House who, at a June 5, 2023 Finance & Budget Committee meeting, was acknowledged by multiple Washington County justices of the peace as offering identical services as Returning Home–except, also for women.[6]

71.    Because there is an official and differential treatment based on gender caused by Washington County's discriminatory funding decisions, the burden of justification rests entirely on the County to show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)) (internal marks in original).

72.    Alternatively, the Equal Protection Clause prohibits irrational laws and requires that governments treat like parties alike. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 602 (2008).

---

[6] Video of meeting at https://www.youtube.com/live/JPQeXHTTdV8 at at 48:00 – 1:09:20. Despite a "do-pass" recommendation, Serenity Magdeline House was not funded.

73.    Washington County's decision to deny the AJRC's application is irrational given that it granted federal funds to two similarly situated nonprofits as the AJRC, Upskill and Returning Home.

74.    Identically to the AJRC, Upskill sought these federal funds to help mitigate the detrimental effects of COVID on a low-income population.

75.    Identically to the AJRC, Returning Home sought these federal funds to help mitigate the detrimental effects of the criminal justice system on a low-income population.

76.    Unlike the AJRC, Upskill and Returning Home both received these federal funds to effectuate Congress's purpose.

77.    There was no rational basis to deny the AJRC's request for funding while simultaneously granting funds to Upskill and Returning Home.

78.    There was no rational basis to subject the AJRC to a farcical application process – in which even those applications recommended for approval were denied anyway – whereas similarly

situated nonprofit organizations were funded without one.

79.　The AJRC is damaged by the disparate treatment in the amount of $290,000.

## Count 3
### Declaratory Judgment (28 USC § 2201)

80.　Washington County appropriated $18.8 million of the federal funds for the purpose of constructing a new jail facility.

81.　The Court should declare that Washington County's use of these federal funds to construct a new jail facility is unlawful. 35 CFR § 35.5(a); Final Rule at 199-200.

82.　The Court should preliminarily and permanently enjoin Washington County from using these federal funds to construct new jail facilities.

## Count 4
### Establishment Clause violation (42 USC § 1983)

83.　The Establishment Clause restricts State action through the

Fourteenth Amendment and, at the barest possible minimum, prohibits governmental funding of religious organizations to the exclusion of similarly situated secular actors. *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 8 (1947); *see also* James Madison, *Memorial and Remonstrance Against Religious Assessments* (reproduced in full at *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 63–74 (1947)); *see also*, generally, Carl H. Esbeck, Jonathan J. Den Hartog, *Disestablishment and Religious Dissent* (University of Missouri Press 2019) (tracing the political and legal effort from 1776-1833 which culminated in the disestablishment of official state churches); *e.g.*, *Tilton v. Richardson*, 403 U.S. 672 (1971) (taxpayer suit–special funding considerations for religious universities, but not secular ones, violates Establishment Clause); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989) (taxpayer suit–special tax breaks for religious publications, but not secular ones, violates Establishment Clause).

84.    Returning Home is a prison ministry and requires that those entrusted to its care undergo Christian programming in order to avoid incarceration in the Washington County jail.

85.    Returning Home is similarly situated as the AJRC because both provide services for the ultimate purpose of reducing the number of inmates at the Washington County jail: Returning Home directly houses inmates, and the AJRC's applied-for use of funds would have reduced the inmate population as fully detailed in its application (Exhibit 1).

86.    Washington County intentionally funded the religious organization but not the secular organization. This violated the Establishment Clause bar against governmental preference for religion. *Everson*, 330 U.S. at 15.

87.    There was no lawful, secular purpose behind using government funds to benefit a prison ministry, especially not when government funds were not made equally available to secular institutions – like the AJRC – which would have furthered a permissible secular purpose of reducing the inmate population.

88.    AJRC is damaged by the disparate funding treatment in the amount of $290,000.

### Jury demand

89.    Plaintiffs demand trial by jury on all issues so triable.

**WHEREFORE** Plaintiffs pray for orders as follows:

(a)    Find Defendant liable to the AJRC for money judgment in the amount of $290,000, plus interest at lawful rates, or for at least for nominal damages;

(b)    Find Defendant liable to Sarah Moore for nominal damages;

(c)    Declare that Defendant's use of these federal funds to build new jail facilities is unlawful;

(d)    Preliminarily and permanently enjoin Defendant from using these federal funds to construct a new jail facility;

(e)    Order Defendant to pay attorney's fees and costs; and

(f)    For all other relief to which Plaintiffs are entitled.

Respectfully submitted on July 19, 2024,

By:   */s/ Matt Kezhaya*
      Matt Kezhaya (ABA # 2014161)
      Kᴇᴢʜᴀʏᴀ Lᴀᴡ PLC
      150 S. Fifth St., Suite 1850
      Minneapolis, MN 55402
phone:   (479) 431-6112
email:   matt@kezhaya.law

## Dᴇᴄʟᴀʀᴀᴛɪᴏɴ

I declare that I have read the allegations and statements in the pre-ceding document and state under penalty of perjury of the laws of the United States that they are true and correct to the best of my knowledge.

*/s/ Sarah Moore*

Signed on July 19, 2024 in Washington County, Arkansas.

## Exʜɪʙɪᴛ ʟɪsᴛ

1. AJRC application
2. NCSC study on Washington County's criminal justice system
3. Washington County's request for qualifications to expand the jail facility
4. Ordinance 2022-123 (appropriating $10 million)
5. Ordinance 2022-124 (appropriating $8.8 million)
6. Final Budget for 2024 (as of February 29, 2024)
7. January 2022 Email from Holman Strategies to then-Sheriff Helder that it was not a compliant use of these federal funds to build new jail facilities.

### CERTIFICATE OF SERVICE

**NOTICE IS GIVEN** that I, Matt Kezhaya, efiled the foregoing document by emailing it to the Clerk's office at <u>fay_info@arwd.uscourts.gov</u> on July 18, 2024 per the CM/ECF system's instructions with copy to all counsel of record and, upon approval by the Clerk, uploading it to the Court's CM/ECF system on July 19, 2024, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*