### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

| | |
|---|---|
| The Liberty Initiative, Inc. (dba "Arkansas Justice Reform Coalition") and Sarah Moore | Plaintiff |
| *vs.* | Case no:<br>5:24-cv-5120-TLB |
| Washington County, Arkansas | Defendant |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS

## INTRODUCTION AND SUMMARY

**COMES NOW** Plaintiff AJRC by and through counsel of record with a response in opposition to the County's motion to dismiss. Docs. 18-19. The County presents five alternative grounds for dismissal, none of which are availing. For ease of discussion, AJRC merges the justiciability issues under a single header and separately addresses (1) why the statutes cited in the complaint give rise to the relief requested from (2) the County's limited argument that the complaint does not plead sufficient facts to proceed toward discovery.

*First,* AJRC has standing to assert the four counts alleged because (1) it suffered a "direct dollars-and-cents injury," the stereotypical example of standing and, as to the Equal Protection and Establishment counts, it suffered an opportunity injury; (2) the complained-of injuries were caused by the County's intentional and differential funding decisions; and (3) the relief sought would redress the injuries complained of. All four claims are ripe for adjudication because the four wrongs asserted have been completed. There is no need for the County to expend the misappropriated funds because that expenditure is imminent. Although

the County asserts a "legislative decision-making" non-justiciability doctrine, the County offers no authority to support the claim and a ruling in favor of this defense would require overruling the *Monell* doctrine.[1] There is no basis to invoke *Pullman* abstention because this case presents no questions of state law, only federal law, and the Supreme Court has categorically rejected the County's proffer that a plaintiff must first give a state court the opportunity to vindicate a federal civil rights claim. The Court should find that it has subject-matter jurisdiction and should deny the County's Rule 12(b)(1) motion in full.

*Second*, the statutes relied upon in the complaint give rise to the relief requested. The Supreme Court has already held that plaintiffs suing under § 1983 do not have to show a Congressional intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. As addressed in the complaint, the AJRC is within that particular class of persons designated by Congress to benefit from these federal funds. Washington County had discretion to disseminate the funds within the terms of the statute, but instead chose to use the funds for an extra-statutory ("illegal") purpose. Contrary to the County's motion to dismiss, the County operated under color of state law, not federal law, when it misappropriated these federal funds.

Rather than address the complaint or binding jurisprudence, the County contends (still without citation to authority) that Section 1983 is not actionable in this case because the appropriation legislation does not itself designate a remedy for private plaintiffs. But the burden is on the defendant to demonstrate that Congress expressly withdrew the Section 1983

---

[1] *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), which holds that political subdivisions of states – including counties – may be held liable for official and unconstitutional policies, practices, or customs.

remedy. Because the County's motion offers no basis to find that the AJRC is *not* within that class of persons to benefit from these federal funds, the Court should deny the County's Rule 12(b)(6) motion to the extent it objects to the actionability of the harms complained of.

*Third*, the County offers narrow arguments that the constitutional counts do not sufficiently plead a plausible cause of action. It does so by ignoring the text of the complaint. As to the Equal Protection Clause count, the County intentionally funded a male-only diversion program to the contemplated exclusion of a gender-neutral diversion program. This is an intentional sex-based discrimination, on which the County has the burden to justify. As a result, dismissal at the pleadings stage is improper. Additionally, as pleaded, the County provided funds to two organizations without need of an application; and no funds to all the other organizations it subjected to an application process, even those which were recommended for approval. The County's *post hoc* justifications do not address why the sham application process was created only to deny all applications, even those recommended for approval. Because the County offers no legitimate interest to underpin its sham process, its "rational basis" argument is just a rationalization. As to the Establishment Clause count, the County directly funded a prison ministry with federal money. This funding decision is not the result of deliberate choices by individuals, which would be constitutional; rather, it is the direct advancement of a particular religious organization over a similarly situated secular entity. If there is one thing the Establishment Clause prohibits, it is government funding of a religious enterprise. The County still presents no attack on the sufficiency of the pleadings as to the declaratory judgment count, the contemplated jail facilities are unrelated to mitigating the effects of COVID. The Court should deny the County's Rule 12(b)(6) motion in full.

# ARGUMENT

## 1: The Court has subject matter jurisdiction; abstention is improper.

The bulk of the County's motion is a facial attack on the Court's subject matter jurisdiction. Separately, the County asserts a ripeness issue and seeks *Pullman* abstention, both of which are threshold issues. *See Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1037 (8th Cir. 2000) (ripeness is a jurisdictional question); City of Houston, Tex. v. Hill, 482 U.S. 451, 469 (1987) (*Pullman* abstention is an "abstention *from* federal jurisdiction") (emphasis added); *see also R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941) (namesake of *Pullman* abstention). Because all three issues raise threshold questions of the Court's jurisdiction, those issues have been collected under this first header.

**Legal standard**

The County's motion to dismiss raises a facial attack on the Court's subject matter jurisdiction. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016). A facial attack is one unsupported by matters outside of the complaint. *Id.* In a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Id.* Those protections entail accepting as true all facts alleged in the complaint, construing all reasonable inferences in the plaintiff's favor, and considering only those materials that are necessarily embraced by the pleadings and exhibits attached to the complaint. *Id.*

Standing consists of a three-element test: (1) a concrete injury-in-fact; (2) which is fairly traceable to the challenged action; and (3) which is redressable by a favorable ruling. *E.g.*, *Murthy v. Missouri*, 144 S.Ct. 1972, 1986 (2024). But the County's motion only attacks the first

element, an injury-in-fact. As a result, this brief will only briefly touch on the second and third elements, causation and redressability.

A standing analysis is predicated on the presumption that the plaintiff will succeed on the merits of its claim. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) (Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted") (internal citation omitted); *Barker v. Conroy*, 921 F.3d 1118, 1124 (D.C. Cir. 2019) ("For purposes of the standing inquiry, we assume Barker would succeed on the merits of his claim;"); *cf. Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 586 F. Supp. 3d 893 (E.D. Ark. 2022), aff'd, 86 F.4th 1204 (8th Cir. 2023) (carefully addressing the "jurisdiction-vs.-merits" question of the private actionability of the Voting Rights Act).[2]

### 1.1: AJRC has sufficiently alleged four injuries-in-fact.

The first element requires a "concrete and particularized" injury-in-fact; one which is "actual or imminent," not "conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The purpose of this element is to ensure that the plaintiff has a direct and personal stake in the litigation. *See id.*, at 574 ("The party who invokes the power of judicial review must be able to show not only that the statute is invalid but that *he has sustained* or is immediately in danger of sustaining *some direct injury* as a result of its enforcement.") (emphasis added) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488-89 (1923)).

---

[2] There, the Eastern District found, and the Eighth Circuit affirmed, that the Voting Rights Act is not itself actionable. However, the plaintiffs there did not bring a § 1983 claim. *See Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204, 1218 (8th Cir. 2023) (rejecting the plaintiffs' "belated request to add a § 1983 claim").

AJRC has alleged three injuries-in-fact: (1) its lawful application for the federal funds was denied; (2) its application was denied pursuant to any combination of: intentional sex discrimination, a farcical application process, or the bare desire to fund a religious organization over like-situated secular competitors; and (3) its application was denied for favor of pursuing an illegal use of the funds. The first count raises a direct "dollars-and-cents" injury, the second count raises an opportunity injury, and the third count is expressly authorized by statute.

### 1.1.1: The misappropriation was an "injury-in-fact."

The thrust of the complaint is a direct dollars-and-cents injury-in-fact. This is the stereotype for standing. *Doremus v. Bd. of Ed. of Borough of Hawthorne*, 342 U.S. 429, 434 (1952); *see also Clementine Co., LLC v. Adams*, 74 F.4th 77, 83 (2d Cir. 2023) ("Any monetary loss suffered by the plaintiff satisfies this element; 'even a small financial loss' suffices.") As alleged, Congress made federal funds available as assistance to nonprofit organizations to aid the response to COVID-19. Am. Compl. ¶ 9; see also 42 USC § 803(c)(1)(A) and 31 CFR § 35.6(b). These federal funds were entrusted to Washington County, not as a slush fund, but "only" for the designated purposes. Am. Compl. ¶ 8; see also 42 USC §§ 801(d), 803(c)(1). The AJRC is a qualifying nonprofit. Am. Compl. ¶ 20, Ex. 1. But the AJRC did not receive any part of these funds because the County instead gave preferential treatment to a similarly-situated religious organization which only diverts male prisoners, because the County deprived the AJRC of the opportunity to compete on equal footing through a sham applications process, and because the County desired to pursue its pre-COVID jail expansion project. See generally Am. Compl. ¶¶ 11-60.

This case would not be before the Court if the County used the funds for Congress's

designated purposes, even if AJRC's application had been denied. *See generally* 42 USC § 803(c)(1), (6). Or, if the County returned the excess it had no intention of using. *See* 42 USC § 803(b)(2)(iv); 31 CFR § 35.5(c). This case only arises because Washington County will imminently use the funds for a non-designated purpose: constructing new jail facilities in open disregard of the statutory text and regulatory guidance. Am. Compl. ¶¶ 26-60; Final Rule,[3] at 199-200. Because the federal funds have been entirely exhausted for an illegal purpose, whereas the AJRC presented Washington County the opportunity to apply them to their intended purpose, the only inference to be drawn is that Washington County refused to fund the AJRC's application so it could use the funds for an unlawful purpose. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) (reversing a dismissal at the pleadings because the district court ignored reasonable inferences supported by the facts alleged). The AJRC has suffered an injury-in-fact because the federal funds were available at the time AJRC demonstrated its eligibility, and was denied for the unlawful reason that the County will instead use the federal funds for a purpose not permitted by the statute or its regulations.

To counter this reasoning, the County claims without citation that the denial of this application, despite that the AJRC was an eligible recipient, does not create an injury-in-fact. Doc. 19 at 4-5. The County offers no citation because the law is the opposite. *E.g., Mansor v. United States Citizenship & Immigr. Servs.*, 685 F. Supp. 3d 1000, 1009–10 (W.D. Wash. 2023) (discretionary denial of eligible applicants to an immigration status still created an injury-in-fact); *Cunningham v. U.S. Dep't of Lab.*, 670 F. Supp. 1062, 1065 (D. Me. 1987) (denial of applicant to a labor status still created an injury-in-fact). The unavoidable facts in the

---

[3] Available at https://home.treasury.gov/system/files/136/SLFRF-Final-Rule.pdf

complaint provide that the AJRC was an eligible recipient of these federal funds, but the funds are instead being misappropriated. Thus, AJRC has pleaded a direct "dollars-and-cents" injury-in-fact to challenge Washington County's decision to exhaust the federal funds for an illegal purpose.

### 1.1.2: The discriminatory treatment was an "opportunity injury."

In Count 2, the complaint alleges an opportunity injury, cognizable under the Equal Protection clause, for disparate treatment. *See Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993):

> [w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.

The inability to compete on equal footing is an injury-in-fact. *McDaniel v. Precythe*, 897 F.3d 946, 950 (8th Cir. 2018) (citing *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003)). There, a death penalty journalist had standing to contest a prison policy which gave the correction department's director "unbridled discretion to deny an adult citizen the benefit of serving as an execution witness based on the individual's viewpoint, expressive or press activity, or membership in a church or other organization." *Id.*, at 949. *McDaniel* even goes farther than this case: the journalist's application to witness an execution never received a response. *Id.* The AJRC's application was denied. Am. Compl. ¶ 64. Tellingly, the County's motion does not argue against the equal opportunity injury alleged in the amended complaint. Thus, AJRC clearly has standing to pursue Count 2.

*1.1.3: The County's unlawful use of the federal funds is analogous to a breach of trust.*

In Count 3, the complaint alleges an injury-in-fact analogous to a breach of trust. When the injury-in-fact inquiry looks for a "concrete" harm, it is sometimes helpful to draw analogy from common law torts. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341–42 (2016). As addressed in § 1.1.1, the AJRC is within that class of persons Congress intended these federal funds to benefit. See 42 USC § 803(c)(1)(A) (a "county shall *only* use the funds … to respond to … the Coronavirus Disease 2019 (COVID-19) or its negative economic impacts, including assistance to … nonprofits") (emphasis added). Congress made these funds available, subject to certain conditions, and then entrusted those funds to Washington County for dissemination consistent with those conditions. That is analogous to a trust. *See Restatement (Second) of Trusts* § 2 (1959) ("A trust … is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it."). As alleged in Count 3, Washington County accepted those funds but is using them for reasons inconsistent with the conditions specified by Congress. That is a breach of trust, to which the intended beneficiaries of those funds – AJRC included – have a legally protected interest. *Restatement (Second) of Torts* § 874, cmt. *b* (1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct *to the person for whom eh should act*") (emphasis added). Again, because AJRC was an eligible recipient of these funds and because Washington County is violating the conditions to which the funds are attached, the AJRC has a direct and personal interest in contesting the illegal use of these funds.

The County contests this count because AJRC is not a citizen of Washington County. Doc. 19, at 5. There are two problems. *First*, contrary to the County's position, this case does

not question the use of Washington County taxes. At issue is the use of federal funds, not county funds. *Second*, even if a Washington County resident was needed to attack the County's illegal use of these federal funds, the amended complaint adds the ARJC's executive director, who is a Washington County resident. Am. Compl. ¶ 5; see also Compl. Ex. 1 (Doc. 16-1), at 4 (project location: Washington County) and 11 (signed in Fayetteville, Arkansas). In its renewed motion to dismiss, the County tacks on an argument that it is irrelevant whether AJRC or Sarah Moore are Washington County residents. Doc. 19, at 5. A litigant's county of residence cannot be both elemental and irrelevant in a constitutional claim against a county, the County cannot have it both ways.

Alternatively, the County argues that there is no basis for federal jurisdiction "to have the Government act in accordance with law." Doc. 19, at 7. In fact, the judiciary is regularly called upon to have the Government act in accordance with the law. For example, the Supreme Court recently addressed the Government's duty to follow the First Amendment when implementing the Lanham Act. *See Matal v. Tam*, 582 U.S. 218 (2017) (declaring unconstitutional the Lanham Act's prohibition against marks that might disparage any persons, as facially invalid under the Free Speech Clause). Similarly, Count 3 asks the Court to find that Washington County's use of the federal funds are unlawful as against Congress's stated conditions for the funds. Because the AJRC has recognized statutory rights and constitutional rights to compete on equal footing as the County's preferred nonprofits (Counts 1, 2, and 4) , the Court should find that the AJRC has standing to attack Washington County's unlawful use of the federal funds. See 28 USC § 2201(a) (empowering courts to issue declaratory judgments "[i]n a case of actual controversy within its jurisdiction.")

*1.1.4: AJRC and Moore have taxpayer standing on the Establishment Clause count.*

The County also contends that neither AJRC nor Moore have taxpayer standing. Doc. 19, at 5-6. As grounds, the County cites *Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806 (8th Cir. 2022). There, the Eighth Circuit recognized taxpayer standing insofar as the Establishment Clause is concerned. *Id.*, at 810 ("The Court in *Flast* held that a taxpayer has standing because the 'Establishment Clause of the First Amendment does specifically limit the taxing and spending power'" of Congress'"); *see also Flast v. Cohen*, 392 U.S. 83 (1968). The amended complaint added an Establishment Clause count. Am. Compl., at 20-22 (Count 4). The amended complaint also cites two taxpayer suits, neither of which are addressed in the County's motion, for the proposition that special taxing or funding considerations for religious organizations violates the Establishment Clause. Id., at ¶ 83 (citing *Tilton v. Richardson*, 403 U.S. 672 (1971); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989)). Insofar as Count 4 is concerned, both AJRC and Moore have clearly shown an Establishment Clause injury-in-fact because the County has overtly funded a religious organization to the exclusion of a similarly situated secular entity: the AJRC.

*1.2: Washington County caused Plaintiffs' injuries.*

The County's motion does not contest the causation element of standing. But jurisdiction can be raised even *sua sponte*, so the element is properly addressed. *See Frost v. Sioux City*, Iowa, 920 F.3d 1158 (8th Cir. 2019) (affirming *sua sponte* dismissal for lack of standing where plaintiff, who did not own a dog, challenged pit bull ban). The injuries complained of were directly caused by Washington County's discriminatory funding decisions and its knowing failure to comply with the statutory constraints on these federal funds. Am. Compl. ¶¶ 13-57, Ex. 7. Because the injuries complained of were directly caused by the challenged decisions,

the causation element is readily shown.

### 1.3: The relief sought will redress Plaintiffs' injuries.

The County challenges the redressibility element, but it only offers a circular argument that there is no injury-in-fact. See Doc. 19, at 7. As its sole citation, the County offers *Brittany O v. Bentonville Sch. Dist.*, No. 5:15-CV-5020, 2016 WL 1064637 (W.D. Ark. Mar. 15, 2016) (subsequent history omitted). There, an injunction against a party who did not cause the injury would not redress the injuries. *Id.*, at *3. But the County does not contest that it and its challenged decisions caused the injury. It is therefore unclear why the County contends that the injunction sought would not redress the injury alleged. Am. Compl., at 23 (*ad damnum* ¶ (d)). Nor does the County address the principal prayers for relief: money judgment and a declaration that the County's use of the funds to construct new jail facilities is unlawful. Id. (*ad damnum* ¶¶ (a)-(c)). Obviously, an order to pay the funds wrongfully denied would compensate the harms alleged in Counts 1, 2, and 4. And a declaration that the use of these federal funds is illegal would vindicate the AJRC's point that the County is misappropriating the funds open disregard of the conditions on these federal funds. *See Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) (discussing the history behind nominal damages as a judicial recognition of a right violated). For a grassroots organization dedicated to criminal justice reform and ameliorating the second-hand effects of incarceration (Am. Compl. ¶ 4), stopping the construction of a new jail facility is of obvious political benefit. That benefit counteracts the harm Washington County caused AJRC by treating the federal aid as a slush fund.

### 1.4: The claims are ripe.

The County re-argues, still without a single citation, that Count 3 is not ripe because the

complaint does not say that the federal funds have been exhausted. Doc. 19, at 17-19. The complaint shows that the injury alleged is imminent. Am. Compl. ¶ 60 ("Washington County lacks the financial resources to construct the new jail facility *without misappropriating the federal funds*") (emphasis added), id. ¶ 64 ("Washington County denied the AJRC's application and *is instead using all of the federal funds for the impermissible purpose of constructing a new jail facility*") (emphasis added); id. at Exhibit 6 (Doc. 16-6), at 2 (line 3046: "American Rescue Plan Act Fund: $0;" line 1006: "ARPA Revenue Replacement Fund: $0").

An injury-in-fact may be litigated when it is "imminent." *Lujan*, 504 U.S. at 560 ("actual *or* imminent") (emphasis added). The ripeness question asks whether an injury that has not yet happened is sufficiently likely to happen. Wright & Miller, *13B Fed. Prac. & Proc. Juris.* § 3531.12 (3d ed.) It is not necessary for Washington County to actually expend the federal funds for the unlawful purpose because at issue is a primarily legal question whether it lawfully *can* expend the federal funds for that purpose. *See id.* ("justiciability may be found more readily when a court believes that it faces a pure question of law that can be decided without further fact development"). No further factual development is needed to determine whether the County will expend these federal funds because it has already misappropriated the federal funds to its buildings budget (Am. Compl. ¶¶ 53-54, Exs. 4-5) and has already solicited bids to design and construct the new jail facility (Am. Compl. ¶¶ 26-54, Ex. 3). And the impact is directly and immediately felt on the AJRC because all of the remaining federal funds have been appropriated for that unlawful purpose. Am. Compl. ¶¶ 60, 64, Ex. 6.

## 1.5: There is no "legislative decision-making" exception to jurisdiction.

The County's motion to dismiss twice asks the Court to dismiss the complaint because the claims intrude in its "legislative decision-making." Not once does the County provide a

citation for a "legislative decision-making" exception to jurisdiction. There is none. *E.g.*, *Baker v. Carr*, 369 U.S. 186, 210 (1962) (regulations under color of State law do not give rise to a political question defense); *Epperson v. State of Ark.*, 393 U.S. 97, 107 (1968) ("the state has no legitimate interest in protecting any or all religions from views distasteful to them"); *Stone v. Graham*, 449 U.S. 39, 41 (1980) ("The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and *no legislative recitation of a supposed secular purpose can blind us to that fact*") (emphasis added). The judiciary is regularly called to examine legislative decision-making, particularly of State and County officials. *E.g.*, *Am. Humanist Ass'n v. Baxter Cnty., Arkansas*, 143 F. Supp. 3d 816 (W.D. Ark. 2015) (County's creche violated Establishment Clause); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977) (an Equal Protection Clause case turns on whether "invidious discriminatory purpose was a motivating factor" which "demands a sensitive inquiry into such circumstantial and direct evidence of *intent* as may be available") (emphasis added). Far from enjoying immunity from inquiries into their intent, county officials are clearly the proper subject of constitutional litigation. *E.g.*, *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (there is no Eleventh Amendment immunity for counties).

## 1.6: *Pullman* abstention is improper.

The County alternatively seeks a *Pullman* abstention. *See Railroad Commission of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). *Pullman* abstention is only appropriate when there is an ambiguity of state law. *See Section 1983 Litigation in State and Federal Courts* § 6:13 ("the pivotal question in determining whether abstention is appropriate is whether the statute is *fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question*") (internal quotation marks omitted); *see also Sisney v. Kaemingk*, 15 F.4th 1181, 1190

n. 2 (8th Cir. 2021) ("*Pullman* abstention is a 'limited' exception to the 'virtually unflagging obligation' that federal courts have 'to exercise their jurisdiction in proper cases.'"). The County offers no ambiguities of state law entailed in this action; rather, it asserts that because the AJRC could hypothetically seek its remedy from the County directly the Court should order it to try. The Supreme Court has already rejected this suggestion. *Zwickler v. Koota*, 389 U.S. 241, 251 (1967) ("abstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim.") Section 1983 is "supplementary to the state remedy" and "the latter need not be first sought and refused before the federal one is invoked." *Monroe v. Pape*, 365 U.S. 167, 183 (1961), overruled on other grounds by *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Because there is no ambiguity of state law at issue in this case, and because the Supreme Court has expressly rejected the County's argument that a Section 1983 claimant must generally pursue state law remedies before invoking federal law remedies, there is no basis for *Pullman* abstention.

## 2: The cited statutes give rise to the relief requested.

Next, the County asserts that there is no private right of action for the cause alleged in Count 1. Doc. 19 at 8-11. The defendant bears the burden to demonstrate that Congress expressly withdrew the Section 1983 remedy. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989); *see also* 1 Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983* § 2:32. To sustain that burden, defendants must show a "comprehensive enforcement scheme" sufficient "to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).

Plaintiffs do not have the burden of showing a Congressional intent to create a private

remedy because Section 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002); *see also Middlesex Cnty.*, at n. 31 ("we do not suggest that the burden is on a plaintiff to demonstrate congressional intent to preserve § 1983 remedies.") A plaintiff need only show that the statute confers "any right at all … on a particular class of persons." *Gonzaga*, 536 U.S. at 284. Here, the statute confers a right upon "nonprofits" who are aiding in the response to the negative economic impacts to COVID-19. 42 USC § 803(c)(1)(A); see also 31 CFR § 35.6(b)(2)[4] ("beneficiaries presumptively impacted … by the public health emergency or its negative economic impacts … [include] (i) Households or populations that experienced unemployment … [and] (iii)(A) … low-income households and populations … [and] (C) Nonprofit organizations operating … in the territories"). The AJRC's application demonstrates eligibility for the federal funds because it would pay for two care managers, who would office at Squire Jehagen Outreach Center (addressed in Fayetteville, Arkansas),[5] who would provide wrap-around services to support clients involved in the criminal system including the amelioration of homelessness and unemployment issues,[6] all of which in furtherance of serving a class of people who suffer "long-standing disparities in health *and economic* outcomes in underserved communities." Am. Compl. Ex. 2 (Doc. 16-2), at 9. The County offers no argument against the plain statutory text or the implemented regulations, asking instead for the Court to "closely

---

[4] The amended complaint mis-cites to Title 35 of the CFR but the relevant regulations are in Title 31.

[5] More particularly, 115 S. Willow Ave. Fayetteville, AR 72701. See https://squirecenter.com/ (last visited July 11, 2024). Compl. Ex. 2, at 5. Fayetteville is the county seat for Washington County.

[6] Am. Compl. Ex. 2 (Doc. 16-2), at 3

scrutinize" the AJRC's application. Doc. 19, at 13. The Court should decline the County's invitation to search the record unaided for arguments in support of the County's motion.

As its sole ground to suggest that Section 1983 does not afford the AJRC a private right of action, the County – again without citation – suggests that its own form can supersede the will of Congress. See Doc. 19 at 12 (citing Compl. Ex. 2 at 11). The law says the opposite. See generally U.S. Const. Art VI, Cl. 2 (the Supremacy Clause); 42 USC § 803(c)(1)(A) (Congress made no mention of "absolute discretion" in the appropriations statute and instead expressly limited counties' discretion on how they can spend these federal funds); *e.g.*, *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016) ("[d]iscretion is not whim," the federal statutes control how the County may spends Congress's money).

Because the AJRC is within the class of persons who Congress designated as beneficiaries of these federal funds, because the County instead using those funds for an extra-statutory purpose, and because the County offers no cognizable argument that Congress intended to withdraw the Section 1983 remedy from its intended beneficiaries, the AJRC has an actionable claim to challenge the County's unlawful use of the funds.

## 3: The complaint articulates plausible claims.

### 3.1: The complaint articulates a plausible challenge to the misappropriation.

The County contests the sufficiency of the pleading as to Count 1, which asserts a misappropriation of the federal funds. Doc. 19, at 11-13. As alleged: the AJRC is within that class of persons who are eligible for the federal funds and construction of new jail facilities is not an eligible use of the federal funds. Am. Compl. ¶¶ 61-65; see also id. at ¶¶ 26-60 (the new jail facility is not related to combating COVID or its effects, this is a pre-COVID political

effort which failed to meet voter approval). The County responds that its own form gave the County "*absolute discretion*" to disseminate the funds as it sees fit. Doc. 19, at 12 (emphasis in original). Again, the federal statutes say otherwise. 42 USC § 803(c)(1)(A) (no mention of "absolute discretion" and instead explicitly limits how the funds may be used). Count 1 is analogous to a breach of trust: Washington County may use the funds as Congress directed, or it may return the funds to the federal government, but it may not use the funds for this unlawful purpose.

### 3.2: The complaint articulates a plausible Equal Protection Clause claim.

Next, the County contests the sufficiency of the pleadings as to the Equal Protection claim. Doc. 19 at 13-15. The County does not contend with the quotation in the complaint: The Equal Protection Clause prohibits "official action that closes a door or denies opportunity to women." *United States v. Virginia*, 518 U.S. 515, 532 (1996). The burden of justification to explain its disparate treatment falls on the defendant. *Id.* As alleged, the County has closed the opportunity for funding a program that reduces the jail population of women while funding a program that reduces the jail population of men. That is not an accidental disparate treatment, the AJRC's application would have benefitted women and was denied. Am. Compl. ¶¶ 67-70. As supplemented through the amended complaint, at ¶¶ 70-71, the issue of sex discrimination was brought to Washington County's governing officials, they indicated an intent to fund a women-prisoner jail diversion program, but that funding never happened. Yet the County offers only an appeal to ignorance. Doc. 8 at 14. The only inference to be drawn by intentionally a funding male-only diversion program, and refusing to fund any women diversion programs is that Washington County closed an opportunity to women which was available to men. The County's motion asks the Court to disregard the allegations

– 18 –

of the complaint and the burden of proof. The Court should deny its motion to dismiss as to the sex discrimination claim.

As to the rational basis argument, the County's motion fails to address the disparate treatment between those who did not have to undergo an application process and those who did. Compare Am. Compl. ¶¶ 11-25 with Doc. 19 at 15. A rational basis review requires the government to present a legitimate governmental purpose which is rationally related to the challenged decision. *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 240 (8th Cir. 1994). Under rational basis review, courts only accept *post hoc* justification which could have been a goal of the classification. *Id*. The issue is not those who were funded *vs.* those who were, but the decision to subject the two classes of nonprofits to different standards to ascertain who would be eligible for funding. The former, funded camp, did not have to undergo any application process. The latter, unfunded camp, had to undergo a sham applications process, under which even those recommended for approval were still denied.

The County offers no *legitimate interest* which bears any rational relationship to creating a sham applications process. Its first argument is that maybe one entity was "better-equipped to address 'the evil at hand for correction." Doc. 19 at 15. But it offers no suggestion what "evil" needed correction nor why literally every applicant was denied funding, even those who were recommended for approval. Am. Compl. ¶¶ 23-25. Alternatively, the County suggests that it may have had "second thoughts" about disseminating the funds without an application process. Doc. 19, at 15-16. But it presents neither caselaw nor convincing argument why "second thoughts" are a *legitimate* governmental interest.

Neither of these *post hoc* justifications could have been the goal of the classification. More likely, if not preaching conversion or simple misogyny, the goal of the disparate funding

processes was in furtherance of simple political corruption. But political corruption is not a legitimate governmental interest. *Cf. Fiore v. City of Detroit*, No. 18-11565, 2018 WL 5014196, at *6 (E.D. Mich. Oct. 16, 2018) ("Rooting out corruption, or the appearance of corruption, is a rational basis for government decision.") There is no rational proffer made by the County's motion, just a request to find that rational basis scrutiny is no scrutiny at all. That argument has already been rejected. *See U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.")

### 3.3: The complaint articulates a plausible Establishment Clause claim.

Last, the County contests the sufficiency of pleadings as to the Establishment Clause claim. As pleaded, the County directly funded a prison ministry which requires Christian programming as a condition to avoid the Washington County jail; and did not fund any other programs which would have reduced the jail population. Am. Compl. ¶¶ 13, 83-88. If there is one thing the Establishment Clause clearly prohibits, it is the direct funding of religious enterprises to the exclusion of like-situated secular entities. *E.g.*, *Tilton v. Richardson*, 403 U.S. 672, 680 (1971) (contribution of value to a religious body held unconstitutional because "the Establishment Clause barred any 'tax levied to support any religious institutions whatever form they may adopt to teach or practice religion'") (cleaned up) (quoting from *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 16 (1947)); *see also Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989) (special tax break for religious publications, but not secular ones, violates the Establishment Clause). This is not a new concept, it goes all the way back to the founding of this great nation. *See* James Madison, *Memorial and Remonstrance Against Religious Assessments* (reproduced in full at *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 63–74 (1947)); Carl H.

Esbeck, Jonathan J. Den Hartog, *Disestablishment and Religious Dissent* (University of Missouri Press 2019) (tracing the political and legal effort from 1776-1833 which culminated in the disestablishment of official state churches). In this country, religious organizations are to be funded *only* by willing donations and not federal tax dollars. *Ibid.; see also Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 669 (1970) ("the basic purpose of these provisions [the Religion Clauses] … is to insure that *no religion be sponsored* or favored, none commanded, and none inhibited" and "Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist *without sponsorship* and without interference.") (emphasis added).

The County does not address *Tilton*, *Everson*, *Bullock*, or Madison's *Remonstrance Against Religious Assessments*, or the undeniable history of this nation as a secular enterprise which is "committed to the support of *no* dogma, the establishment of *no* sect;"[7] each of which are cited in the amended complaint at ¶ 83. Instead, the County merely contends that it was not its "*purpose*" to advance religion. Doc. 19, at 17 (emphasis in original). The inquiry is into effect. *E.g.*, *Tilton*, 403 U.S. at 679 ("Here the Act is challenged on the ground that its *primary effect* is to aid the religious purposes of church-related colleges and universities") (emphasis added); *Bullock*, 489 U.S. at 9 (a statute must possess "a secular legislative purpose" and "its *principal or primary effect* … [must] be one that neither advances nor inhibits religion") (emphasis added); *Est. of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (statute violated Establishment Clause because it "has a *primary effect* that impermissibly advances a particular religious practice") (emphasis added); *Agostini v. Felton*, 521 U.S. 203, 223 (1997) ("we continue to explore

---

[7] *Watson v. Jones*, 80 U.S. 679, 728 (1871) (emphasis added)

whether the aid has the '*effect*' of advancing or inhibiting religion") (emphasis added).

The irreconcilable Establishment Clause problem presented by the amended complaint is that Washington County did not disseminate these federal funds neutrally to all nonprofits which reduce the number of inmates; rather, the federal funds were only made available to reduce the number of prisoners who are willing to accept Christian programming. *Cf. Agostini*, 521 U.S. at 231 (Establishment Clause not violated "where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis.") This funding was not made universally available at the discretion of individual choice, it was directly handed to the religious entity. *Cf. Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) (The Establishment Clause "permits government aid to reach religious institutions only by way of the deliberate choices of numerous individual recipients"). Because Washington County directly funded a religious entity, it violated the Establishment Clause rights of all Americans – including AJRC and Moore – to a secular government. Because Washington County intentionally funded a religious entity to the contemplated exclusion of its similarly-situated secular competitors – particularly the AJRC – it violated the AJRC's Establishment Clause rights. *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 703 (1994) ("the heart of the Establishment Clause [is ] that government should not prefer … religion to irreligion.")

**WHEREFORE** the Court should deny the County's motion to dismiss in full.

Respectfully submitted on August 15, 2024,

By:   */s/ Matt Kezhaya*

Matt Kezhaya (ABA # 2014161)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:   (479) 431-6112
email:   matt@kezhaya.law

## CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on August 15, 2024, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*