IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**THE LIBERTY INITIATIVE, INC.,**
d/b/a Arkansas Justice Reform Coalition;
and SUSAN MOORE                                                                  PLAINTIFFS

V.                                    CASE NO. 5:24-CV-5120

**WASHINGTON COUNTY, ARKANSAS**                                                   DEFENDANT

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Washington County, Arkansas's Motion to Dismiss (Doc. 16), to which Plaintiffs The Liberty Initiative, Inc. (d/b/a Arkansas Justice Reform Coalition) ("AJRC") and Sarah Moore filed a Response in Opposition (Doc. 22), and Washington County filed a Reply (Doc. 24). On September 12, 2024, the Court held a hearing on the Motion and took the matter under advisement. For the reasons below, the Motion is **GRANTED** and the case **DISMISSED**.

### I.  BACKGROUND

This case concerns Washington County's use of federal funds meant to combat the devastating effects of the COVID-19 pandemic. The American Rescue Plan Act passed by Congress in 2021 established the Coronavirus State and Local Fiscal Recovery Funds Program, which authorized the United States Treasury Department to distribute $350 billion to state, territorial, local, and tribal governments to assist them in responding to the economic and public health impacts of the COVID-19 global pandemic. *See* 42 U.S.C. § 603(c); 42 U.S.C. §§ 802 & 803. The Coronavirus Local Fiscal Recovery Fund ("CLFRF") allocated $65.1 billion to be shared among the various counties of the

1

United States according to population. *See* 42 U.S.C. § 803(b)(3). Each county was authorized to receive a payment divided in two equal "tranches," the first of which was to be paid in mid-2021 and the second in mid-2022. *See id.* § 803(b)(7).

Washington County received a total of $46 million in CLFRF funds, half in June 2021 and the other half in June 2022. The federal government broadly authorized the use of these funds in a variety of different ways. For example, counties could distribute the funds to individual "households" and "small businesses" or to "industries such as tourism, travel, and hospitality" that were badly affected by the pandemic. *Id.* at § 803(c)(1)(A). Counties could also make "premium pay[ments]" to county employees performing "essential work" or grant the funds to "eligible employers that have eligible workers who perform essential work." *Id.* at § 803(c)(1)(B). Funds could be used "for the provision of government services" up to a certain dollar amount or "to make necessary investments" in water or sewer infrastructure. *Id.* at § 803(c)(1)(C)–(D). And, as pertinent to the claims in the instant case, the federal government contemplated that a county "*may*" transfer some of its funds "to a private nonprofit organization" providing COVID-19 relief and recovery services. *Id.* at § 803(c)(3) (emphasis added).

According to the Amended Complaint, a few months after the County received the first half of its CLFRF funds, it solicited public bids for a construction project to expand the Washington County Detention Center, a jail that houses both state and federal inmates. Next, in January 2022, the County hired a private consultant to advise whether CLFRF funds could be used for the project. Around this same time, the County made a substantial $2.9 million distribution of CLFRF funds to a local nonprofit called Upskill

2

NWA, which trains healthcare workers.

In June 2022, the County received the second half of its CLFRF allocation. And in July, the County's legislative body, the Quorum Court, met to discuss plans to expand the jail. Given the project's expected price tag of $113.5 million, the members decided to hold a special election in November to ask the public for approval of a tax hike to fund the project. In the meantime, sometime in October 2022, the County transferred some of its CLFRF funds to a nonprofit called Returning Home, which operates a jail diversion program for men. And around this same time, the County set up a formal online application process for nonprofits seeking CLFRF funds.[1]

Plaintiff AJRC, whose mission is to assist low-income populations affected by the criminal justice system, filled out an application requesting $290,000. Forty-five other nonprofits also applied. Washington County then retained the Northwest Arkansas Economic Development District ("NAEDD"), a local nonprofit specializing in economic growth and development, to review the applications and advise whether any of them were worth funding. According to the Amended Complaint, the NAEDD recommended funding for seven applicants—though AJRC does not claim it was one of them. *See* Doc. 16, ¶¶ 21–24.

---

[1] The Amended Complaint does not state exactly when the County implemented the nonprofit application process, but counsel for the County confirmed at the motion hearing that the Quorum Court "created" the online application form after it agreed to fund Upskill NWA's and Returning Home's requests. *See* Doc. 31, p. 24. The Court asked Plaintiffs' counsel whether he agreed with the County's timeline, and he concurred that "the application process arose after" the County funded Upskill and Returning Home. *Id.* at p. 33.

On November 8, 2022, the voters of Washington County rejected the Quorum Court's proposal for a tax increase to fund the jail-expansion project. Shortly thereafter, on December 15, 2022, the County adopted an ordinance appropriating $18.8 million in CLFRF funds to expand the jail. The County did not approve funding for *any* of the forty-six nonprofits that requested money—including AJRC. These decisions prompted AJRC to file suit.

There are four causes of action listed in the Amended Complaint. Count 1 asserts that the County deprived AJRC of its "right" to a portion of the County's CLFRF funds in violation of 42 U.S.C. § 1983. Counts 2 and 4, also § 1983 claims, allege that the County discriminated against AJRC on the bases of sex and religion by granting CLFRF funds to nonprofit Returning Home. Finally, Count 3 asks the Court for a declaratory judgment that the County's intended use of funds for jail construction is illegal.

## II. LEGAL STANDARD

To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). A pleading containing mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

4

do not suffice" and are "not entitled to the assumption of truth."). Instead, "[t]he complaint must allege facts, which, when taken as true, raise more than a speculative right to relief." *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008).

### III. DISCUSSION

Beginning with Count 1, AJRC has no federal right to a portion of the County's CLFRF funds—which means AJRC lacks standing to assert this claim. Standing requires: (1) an injury-in-fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent"; (2) an injury that is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) a showing that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). AJRC does not have any legally protected interest in the County's federal funds. The County was *permitted* to transfer funds to nonprofits but was not *required* to do so. *See* 42 U.S.C. § 803(c)(3). Further, the County's application process made no guarantee of funding. *See* Doc. 16-1, p. 11 ("The County Board has absolute discretion about approving applications for funding. . . . Not ALL applicants meeting guidelines are guaranteed funding."). As for Ms. Moore, AJRC's Executive Director, the Amended Complaint does not attempt to explain how she has standing to assert Count 1. Therefore, Count 1 is subject to dismissal under Rule 12(b)(6).

Next, Count 2 is also subject to dismissal because it fails to satisfy the plausibility test established in *Iqbal* and *Twombly*. Count 2 asserts a violation of Equal Protection; however, the facts in the Amended Complaint do not plausibly suggest that the County's

grant of funds to Returning Home was a gender-based or religion-based government act. AJRC asserts that discriminatory intent can be inferred from the fact that it (and forty-five other nonprofits) had to apply for funding, but Returning Home did not. Importantly, though, AJRC does not challenge the County's grant of $2.9 million to nonprofit Upskill NWA—despite the fact that this grant was also made *before* the County implemented its formal application process.

It is telling that the Amended Complaint contains no facts to plausibly suggest that discriminatory animus motivated the County's decision to fund either of the two nonprofits that received CLFRF funds. "A fundamental principle of equal protection is that the Constitution only prohibits intentional or purposeful discrimination by the state." *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994). AJRC suggests the County implemented the application process *for the purpose of* discriminating against AJRC on the basis of gender and religion; in fact, AJRC's counsel went so far as to call the application process a "sham" devised by the County to distract the public from its obviously discriminatory activities. (Doc. 31, pp. 30–31, 33). But the problem with AJRC's argument is that the County *did fund* a nonprofit that serves both sexes and has no religious mission without requiring an application first: Upskill NWA. The County's treatment of Upskill, a comparator to AJRC in terms of sex and religion, undermines the plausibility of AJRC's disparate treatment claim and shows the County's application process was intended for some government purpose *other than* sex or religious discrimination. Furthermore, AJRC admits that after the application process was put in place, the County denied all forty-six

applicants without regard to sex, religion, race, national origin, or disability—which, again, indicates a lack of discriminatory animus.[2]

Moving on to AJRC's last § 1983 claim in Count 4, alleging a violation of the Establishment Clause, this, too, is easily dismissed for failure to state a claim. AJRC contends the County expressed a preference for religion, in violation of the Constitution, by "subsidizing" Returning Home with a grant of CLFRF funds. See Doc. 31, p. 38. According to *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), government action does not violate the Establishment Clause if it has a secular purpose, does not have a primary effect of advancing or inhibiting religion, and does not result in excessive entanglement with religion. Here, the Amended Complaint does not plausibly allege that the County's purpose in funding Returning Home's grant request was to advance religion. Returning Home is not a church; it is a nonprofit whose purpose is "reducing the number of inmates at the Washington County jail" by "directly hous[ing]" them and providing services in lieu of incarceration. (Doc. 16, ¶¶ 68, 75, 85). "The Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs." *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 474 (2020). Here, AJRC offers

---

[2] Along the same lines, the Equal Protection claim fails because AJRC is not similarly situated in all respects—except for sex and religion—to Returning Home. *See, e.g.*, Doc. 16, ¶ 85 (admitting that Returning Home houses inmates through a jail diversion program, but AJRC does not). "[T]he initial inquiry in analyzing an equal protection claim is to determine whether a person is similarly situated to those persons who allegedly received favorable treatment." *United States v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995). Since AJRC and Returning Home are not otherwise similarly situated, the Court cannot plausibly infer that the County's reasons for funding one nonprofit over the other were discriminatory.

only conclusory allegations to support its claim that the County's process for dispensing CLFRF funds to nonprofits was not neutral.

Lastly, with respect to Count 3's request for a declaratory judgment, the crux of the claim is that Ms. Moore "is a taxpaying citizen who resides in Fayetteville . . . and objects to Washington County's unlawful use of her tax dollars." (Doc. 16, ¶ 5). She therefore asks the Court to declare unlawful the County's intended use of CLFRF funds to expand the jail and to enjoin the use of such funds. First, the Court observes that if Ms. Moore does have standing to complain about the County's intended use of CLFRF funds, such standing arises from her status as a Washington County taxpayer. The County correctly points out that the funds at issue here are not tax funds; they are funds the federal government has bestowed upon the County to use in its discretion for COVID-19 relief efforts. Second, there is no private right of action available under the American Rescue Plan Act, *see Yaritz v. IRS*, 2023 WL 5756462, at *3 (D. Minn. Apr. 26, 2023) (collecting cases); and the Federal Declaratory Judgment Act does not create an independent right of action absent an underlying case or controversy, *see* 28 U.S.C. § 2201. Since the Amended Complaint fails to state a claim for the violation of any substantive right, the request for a declaratory judgment action must be dismissed.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Washington County's Motion to Dismiss (Doc. 18) is **GRANTED** for the reasons stated herein, and all claims are **DISMISSED**. Judgment will enter concurrently with this Opinion.

**IT IS SO ORDERED** on this 19th day of March, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

9